MICHAEL E. HARRISON ET AL. *v.* MONTGOMERY
COUNTY BOARD OF EDUCATION ET AL.

[No. 17, September Term, 1982.]

*Decided March 2, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), specially assigned.

*Jacob A. Stein,* with whom were *Glenn A. Mitchell, Basil J. Mezines, Gerard E. Mitchell, Michael G. Charapp, Robert F. Muse* and *Stein, Mitchell & Mezines* and *Robert Paul Hillerson* on the brief, for appellants.

*H. Thomas Howell* and *John H. Mudd,* with whom were *Susan T. Preston, David R. Owen, Semmes, Bowen & Semmes, Paul V. McCormick* and *McCormick, Sullivan & Talbott* on the brief, for appellees.

*Amicus curiae* brief of Maryland Trial Lawyers' Association, Inc. filed. *Leo A. Hughes, Jr., David E. Furrer* and *Steen, Hughes & Seigel* on the brief.

*Amici curiae* brief of The National Association of Independent Insurers and Alliance of American Insurers filed. *James J. Doyle, Jr., Carl W. Caputo* and *Doyle & Langhoff* on the brief.

*Amicus curiae* brief of The Motor Vehicle Manufacturers Association of the United States, Inc. filed. *Edward S.*

*Digges, Jr., Robert Dale Klein, Michael T. Wharton* and *Piper & Marbury* and *William H. Crabtree* on the brief.

*Amici curiae* joint brief filed by Baltimore Gas and Electric Company, Delmarva Power & Light Company of Maryland, The Potomac Edison Company and Potomac Electric Power Company. *James A. Biddison, Jr., Valarie R. Watts, Robert B. Murdock* and *H. Edward Holtz* on the brief.

*Amicus curiae* brief of The Alliance of American Insurers filed. *James J. Doyle, Jr., Carl W. Caputo* and *Doyle & Langhoff* on the brief.

MURPHY, C. J., delivered the opinion of the Court. DAVIDSON, J., dissents and filed a dissenting opinion at page 463, *infra.*

The issue in this case is whether the common law doctrine of contributory negligence should be judicially abrogated in Maryland and the doctrine of comparative negligence adopted in its place as the rule governing trial of negligence actions in this State.

I

On April 26, 1978, Michael Harrison, fourteen years old and an eighth-grade student at Gaithersburg Junior High School in Montgomery County, attended a required physical education class. Since the weather was bad, the class was held in the school gymnasium, with approximately sixty-three children participating in a "free exercise" day. The teachers allowed the students to use any of several pieces of athletic equipment in the gym. Along with several other students, Michael practiced tumbling maneuvers on a crash pad (a cushion six to eight inches thick) located at the end of a wrestling mat. On the last of several attempts to complete a running front flip, Michael apparently lost control and was severely and permanently injured when he landed on his neck and shoulders. As a result of his injuries,

Michael is now a quadriplegic who requires constant supervision and attention.

Michael's mother, for herself and on Michael's behalf, filed suit in the Circuit Court for Montgomery County against the Montgomery County Board of Education and the three gym teachers present when the accident occurred. The suit, in three counts, alleged negligence on the part of all defendants in allowing Michael to engage in a dangerous activity without proper supervision; in failing to properly train Michael before permitting him to engage in the dangerous activity; and in failing to provide proper equipment to protect Michael while he engaged in the dangerous activity. Negligence on the part of the Board in failing to properly train the defendant teachers was also alleged in another count of the declaration.

At the ensuing jury trial, the defendants relied, in part, upon the doctrine of contributory negligence as a complete defense to the plaintiffs' claim. The plaintiffs, on the other hand, sought jury instructions that the doctrine of comparative negligence, and not contributory negligence, should be applied. Specifically, the plaintiffs sought three instructions: (1) a "pure" comparative negligence instruction to the effect that if Michael was negligent, and his negligence was a cause of his injury, the jury "must diminish his damages in proportion to the amount of negligence attributable to him"; (2) a "modified" form of comparative negligence that if Michael's negligence "was not as great as defendants' negligence, [he] may still recover damages but his damages must be diminished in proportion to the amount of negligence attributable to him"; and (3) another "modified" form of comparative negligence that if Michael was only slightly negligent, and the negligence of the defendants was gross in comparison, Michael could still recover "but his damages must be diminished in proportion to the amount of negligence attributable to him."

The trial judge (John F. McAuliffe) rejected the plaintiffs' proposed comparative negligence instructions. Instead, he instructed the jury, in accordance with the established law of Maryland, that if Michael was contributorily negligent, it would be a complete bar to the plaintiffs' claim. Judge

McAuliffe defined contributory negligence as "the failure of a plaintiff to act with that degree of care which a reasonably prudent person would have exercised for his own safety under the same or similar circumstances." The jury returned a verdict in favor of all defendants and the plaintiffs appealed to the Court of Special Appeals. We granted certiorari prior to decision by the intermediate appellate court to consider the significant issue of public importance raised in the case.

## II

The plaintiffs argue that the doctrine of contributory negligence is outmoded, unfair, has no place in modern tort law and should be abandoned in favor of comparative negligence. They contend that application of the contributory negligence doctrine worked a substantial injustice in this case which involves permanent damage to Michael's spinal cord. They say that Michael has extensive paralysis and is totally dependent on others for all of his physical needs, his chances of improvement being all but nonexistent. They contend that the evidence of negligence on Michael's part was slight, at best. The plaintiffs suggest that in light of the substantial evidence of the defendants' negligence, it is unfair and unjust that Michael must bear the burden of this devastating injury by himself. The plaintiffs maintain that thirty-eight states, Puerto Rico, the Canal Zone, the Virgin Islands, Guam, and virtually every common law and civil law nation, including England, have abandoned contributory negligence and have adopted a rule that apportions damages on the basis of respective fault. They argue that contributory negligence is a judicially created rule in Maryland, which this Court is empowered to and should now change. They urge our understanding that the doctrine is not only harsh and unjust, but that in a legal system which rests on liability for fault, it is an anomaly that fault on the part of the plaintiff can completely relieve the defendant of all liability. In support of their position, the plaintiffs draw attention to the barrage of criticism levelled by the legal

commentators against the "all or nothing" extreme required by application of the contributory negligence rule. Virtually all of these scholarly writings, plaintiffs suggest, advocate abolition of contributory negligence as being a harsh and arbitrary rule, one contrary to the basic notion of tort law that liability must be determined by fault. According to the plaintiffs, most of the commentators advocate adoption of the "pure" form of comparative negligence which apportions losses on the basis of fault, with each party bearing the portion of the loss directly attributable to his conduct. They rely, in particular, upon two articles in Volume 41 of the Maryland Law Review (1982): E. Digges and R. Klein, *Comparative Fault in Maryland: The Time Has Come,* at 276-299 and K. Abraham, *Adopting Comparative Negligence: Some Thoughts for the Late Reformer,* at 300-315.

Additionally, the plaintiffs rely upon cases in eight states which have judicially abrogated the doctrine of contributory negligence in favor of the rule of comparative negligence. *See Kaatz v. State,* 540 P.2d 1037 (Alaska 1975); *Li v. Yellow Cab Co.,* 13 Cal.3d 804, 532 P.2d 1226, 119 Cal. Rptr. 858 (1975); *Hoffman v. Jones,* 280 So.2d 431 (Fla. 1973); *Alvis v. Ribar,* 85 Ill.2d 1, 421 N.E.2d 886 (1981); *Goetzman v. Wichern,* Iowa, 327 N.W.2d 742 (1982); *Placek v. City of Sterling Heights,* 405 Mich. 638, 275 N.W.2d 511 (1979); *Scott v. Rizzo,* 96 N.M. 682, 634 P.2d 1234 (1981); *Bradley v. Appalachian Power Co.,* 256 S.E.2d 879 (W. Va. 1979). Of these jurisdictions, seven have adopted the "pure" form of comparative negligence which permits a plaintiff to r ecover the portion of his damages caused by the defendant's fault, even though the plaintiff's fault might exceed that of the defendant. As reported in the Digges & Klein article, five other states have adopted this form of comparative negligence by statute,[1] as has the proposed, but not yet adopted, Uniform Comparative Fault Act promulgated in 1977 by the National Conference of Commissioners on Uniform State Laws.[2] The "modified" form of comparative

---

1. The states are: Mississippi (1910); Rhode Island (1971); Washington (1973); New York (1975); Louisiana (1979).
2. The Uniform Act is set forth in Digges & Klein, *supra,* 41 Md. L. Rev. at 296-299.

negligence, adopted in twenty-seven states, permits the plaintiff to recover if his fault is relatively small in contrast with that of the defendant.[3]

In urging our adoption of the "pure" form of comparative negligence, the plaintiffs say that it is the fairest of the comparative fault systems. They suggest that we align ourselves with those states which, by judicial decision, have abandoned contributory negligence and adopted pure comparative negligence principles. They argue that circumstances have changed drastically since we originally adopted the contributory negligence doctrine in 1847; that comparative negligence is preeminently "lawyer's law," with which the Court is better qualified to deal than is the legislature; and that legislative inaction should not be viewed as tantamount to rejection of the comparative negligence doctrine. Finally, the plaintiffs urge that we not adopt the doctrine of pure comparative negligence on a purely prospective basis. They contend that no considerations of basic fairness preclude affording retroactive effect to the newly accepted doctrine, and particularly so in Michael's case, which arose in 1978.

Proper consideration of the issue in this case necessitates a brief review of the origin, adoption and development of the doctrines of contributory and comparative negligence.

---

**3.** Digges & Klein, in their article, 41 Md. L. Rev. at 281, divide modified comparative fault systems into three general types:

1. *"Slight/Gross"*: The plaintiff may recover that portion of his damages caused by the defendant's gross fault, unless the plaintiff's fault is not slight in contrast to the defendant's, in which case the plaintiff recovers nothing. Nebraska and South Dakota have adopted this approach by statute.

2. *"Not As Great As"*: This form permits a plaintiff to recover only if his fault is less than that of the defendant. West Virginia, by judicial decision, has adopted this approach as by statute has Arkansas, Colorado, Georgia, Idaho, Kansas, Maine, North Dakota, Utah and Wyoming.

3. *"Not Greater Than"*: Under this form, if the plaintiff's fault is less than or equal to the defendant's fault, the plaintiff may recover damages reduced by the percentage of his own fault. Fifteen states have adopted this form by statute: Connecticut, Hawaii, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, Ohio, Oklahoma, Oregon, Pennsylvania, Texas, Vermont and Wisconsin.

(A)

## Contributory Negligence

The first reported case in the development of this doctrine was *Butterfield v. Forrester,* 11 East 60, 103 Eng. Rep. 926 (1809).[4] In that English case, Butterfield left a public inn at dusk, mounted his horse and rode off "violently" down the street. Forrester, who was effecting some repairs to his house, had placed a pole in the roadway. Although Butterfield could have seen and avoided the obstruction, he did not and was injured. The court there noted:

"One person being in fault will not dispense with another's using ordinary care for himself. Two things must concur to support this action, an obstruction in the road by the fault of the defendant, and no want of ordinary care to avoid it on the part of the plaintiff." *Id.* at 61, 103 Eng. Rep. at 927.

That this new doctrine was enunciated without citation to authority has been attributed to the extension into the newly developed negligence action of the older and well accepted proximate cause principle that one could not recover for damages which he caused to himself. Turk, *Comparative Negligence on the March,* 28 Chi.-Kent L. Rev. 189, 195-97 (1950). American courts were receptive to the doctrine of contributory negligence, beginning with *Smith v. Smith,* 19 Mass. (2 Pick) 621 (1824). Acceptance thereafter was so swift and widespread that one court was led to proclaim that contributory negligence had been the "rule from time immemorial, and it is not likely to be changed in all time to come." *Penn. R. Co. v. Aspell,* 23 Pa. 147, 149, 62 Am. Dec. 323, 324 (1854).

---

4. Although some commentators trace the doctrine of contributory negligence to earlier times, *see, e.g.,* 8 Holdsworth, *A History of the English Law,* 459-61 (2d ed. 1937) (contributory negligence "a natural and logical doctrine" which found expression in 17th century opinions but was recognized much earlier), most modern courts and scholars agree with Dean Prosser in attributing the first recorded formulation of the doctrine to the *Butterfield* case. W. Prosser, *Handbook of the Law of Torts* 416 (4th ed. 1971).

Many reasons have been advanced for the doctrine's rapid acceptance in this country. One of the strongest was a distrust of the supposedly plaintiff-minded jury in the early nineteenth century, and a corollary desire to limit the liability of newly developing industry. Application of the doctrine permitted courts to take cases from suspected plaintiff-oriented juries, or to at least limit the jury's discretion.[5] The doctrine was compatible with several unwritten policies of the common law at the time, *i.e.*, (a) the view that courts should not assist a wrongdoer who suffered an injury as a result of his own wrongdoing, and (b) a passion for a simple issue that could be categorically answered yes or no, or at least reduced to finding a single, dominant, "proximate" cause of every injury.[6] Additional justification for the rule was found in theories of proximate causation, punishment of the negligent plaintiff, encouragement to comply with the community's standard of care, and the alleged inability of juries to measure the amount of damage attributable to the plaintiff's own negligence. *See, e.g.*, W. Prosser, *Handbook of the Law of Torts* at 417-18 (4th ed. 1971).

Maryland adopted the doctrine of contributory negligence in 1847 in *Irwin v. Spriggs*, 6 Gill 200. As in most other jurisdictions, the doctrine was modified in this State by adoption of the last clear chance doctrine. In *N.C.R.R. Co. v. State, Use Price*, 29 Md. 420, 436 (1868), the Court held: "The mere negligence or want of ordinary caution on the part of the deceased . . . would not disentitle the plaintiff to recover . . . if the defendant might, by the exercise of care on its part, have avoided the consequences of the neglect or carelessness of the deceased." Some commentators have attributed adoption of the doctrine of last clear chance to the asserted harshness of the contributory negligence rule. *See* Digges & Klein, *supra,* 41 Md. L. Rev. at 276. Nothing in

---

**5.** *See* Prosser, *Handbook, supra,* at 418; H. Woods, *Comparative Fault* 8 (1978); Malone, *The Formative Era of Contributory Negligence,* 41 Ill. L. Rev. 151, 151-52 (1946).

**6.** Prosser, *Handbook, supra,* at 418; Wade, *Comparative Negligence — Its Development in the United States and Its Present Status in Louisiana,* 40 La. L. Rev. 299 (1980); Woods, *Comparative Fault,* at 9.

*N.C.R.R. Co. v. State, Use Price, supra,* lends any direct support to this hypothesis. Nor does another exception to the application of the contributory negligence doctrine, *i.e.,* a case involving a plaintiff under five years of age *(see Taylor v. Armiger,* 277 Md. 638, 649, 358 A.2d 883 (1975)) — indicate any general dissatisfaction with the contributory negligence doctrine. Indeed, Maryland has steadfastly adhered to the doctrine since its adoption in 1847. Thus, at the time of trial in the present case, it was the well-established law of this State that a plaintiff who fails to observe ordinary care for his own safety is contributorily negligent and is barred from all recovery, regardless of the quantum of a defendant's primary negligence. *Schweitzer v. Brewer,* 280 Md. 430, 374 A.2d 347 (1977); *Menish v. Polinger Company,* 277 Md. 553, 356 A.2d 233 (1976); *P. & C. R. R. Co. v. Andrews,* 39 Md. 329 (1874). The rule was most recently applied by the Court in *Moodie v. Santoni,* 292 Md. 582, 441 A.2d 323 (1982).

## (B)

### Comparative Negligence

Most commentators trace the roots of comparative negligence to Roman law. Woods, *Comparative Fault* at 17. In common law jurisdictions, the earliest application of the doctrine was in admiralty law where the rule which evolved provided for an equal division of damages among parties at fault, rather than an apportionment based on fault. Woods, *Comparative Fault* at 18-20. In England, the divided damages rule persisted in Admiralty until changed by statute in 1911 to pure comparative negligence. *Id.* at 20. American courts followed the early English equally divided damages rule until 1975, when, in *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S. Ct. 1708, 44 L. Ed. 2d 251 (1975), the Supreme Court adopted a comparative negligence rule in admiralty cases.

Outside of admiralty law, one jurisdiction experimented with comparative negligence theory in the 19th century. In

*Galena & Chicago Union R.R. Co. v. Jacobs,* 20 Ill. 478 (1858), the Supreme Court of Illinois repudiated contributory negligence and adopted a form of comparative negligence in its place. It said:

> "[T]he degrees of negligence must be measured and considered, and wherever it shall appear that the plaintiff's negligence is comparatively slight, and that of the defendant gross, he shall not be deprived of his action." [7] *Id.* at 497.

In *P. & C. R. R. Co. v. Andrews,* 39 Md. 329 (1874), this Court expressly declined to adopt the comparative fault doctrine. Referring to an Illinois decision, we said:

> "[A]s we understand it, [the decision] was actually rested upon a principle of law established in that State, that where there has been contributing negligence, the negligence of both parties must be *compared,* and if the plaintiff is guilty of negligence, which is slight as compared with that of the defendant, he may recover. Such a principle has never been sanctioned in this State, but the exact contrary is the settled rule here, *(N.C.R.R. Co. v. Geis,* 31 Md. 366,) and the Illinois Court admit the doctrine is not supported by the weight of authority elsewhere." *Id.* at 351 (emphasis in original).

Early in the 20th century, Maryland did incorporate a form of comparative negligence legislatively in several specific areas. In "certain perilous occupations," a statute provided compensation for work-related injuries with divided damages where there was negligence by both the worker and the employer. *See* ch. 139 of the Acts of 1902. This statute was repealed when a comprehensive

---

7. Illinois followed this rule for twenty-seven years, abandoning it, however, in 1885 in Calumet Iron & Steel Co. v. Martin, 115 Ill. 358, 3 N.E. 456. In that case, the court readopted the contributory negligence doctrine as a total bar to a plaintiff's recovery. As earlier indicated, Illinois again abandoned the contributory negligence doctrine in favor of pure comparative negligence in Alvis v. Ribar, 85 Ill.2d 1, 421 N.E.2d 886 (1981).

Workmen's Compensation Act was adopted by ch. 800 of the Acts of 1914. A "purer" form of comparative negligence was adopted by ch. 412 of the Acts of 1902 — a public local law applicable in Allegany and Garrett Counties to injured coal and clay miners. This statute was also repealed upon adoption of a mandatory compensation plan, a forerunner of the later Workmen's Compensation Act. *See* ch. 153 of the Acts of 1910.

In 1908, Congress adopted comparative negligence in the Federal Employers Liability Act (FELA), a statute covering injuries to railroad employees, 45 U.S.C. § 51 *et seq.* A number of states enacted similar legislation. *See* Turk, *Comparative Negligence on the March,* 28 Ch.-Kent L. Rev. at 334. In 1910, Mississippi enacted the first "pure" comparative negligence statute applicable to all suits for personal injuries. Miss. Code Ann. § 11-7-15 (1972). Wisconsin, in 1931, was the first state to adopt a "modified" comparative negligence statute, in which a plaintiff could not recover unless his negligence "was not as great as the negligence of the person against whom recovery is sought." Wis. Stats. § 895.045 (1966).[8] Of the thirty-nine states which have now adopted some form of comparative negligence, thirty-one have done so by statute while the remaining eight have done so by judicial decision.

## (C)

That pure comparative negligence is favored by the legal commentators and text authorities appears clear. As we earlier observed, one of the primary reasons advanced by the doctrine's advocates is that wrongdoers are required to shoulder a proportionate share of the damages caused by their own negligence. An almost boundless array of scholarly writings now exists on the subject of comparative negligence. These authorities have carefully marshalled and

---

**8.** The Wisconsin statute was later amended to provide that contributory negligence did not bar recovery if the plaintiff's negligence was not "greater than" the negligence of the defendant. Wis. Stats. § 895.045 (1982 — 1983 Supp.).

crystallized the reasons favoring adoption of a comparative fault system; at the same time, they have set forth the reasons advanced in justification of the continuation of the contributory negligence doctrine.[9] In this regard, one of the main arguments against adopting comparative negligence principles is the claimed difficulty, if not impossibility, of making an accurate apportionment of fault. Comparative negligence proponents, however, point to the lack of any problem in this regard in the states which, by legislation or judicial decision, have adopted the doctrine. Another criticism of comparative negligence is that in the doctrine's application most negligence cases will ultimately be submitted to the jury (once a prima facie case of the defendant's negligence is established) and recovery will be left in the unfettered discretion of the jury. The response to this criticism is that juries already apply a "rough-cut" comparative negligence formulation, even when instructed that contributory negligence is an absolute bar to the plaintiff's recovery. But while "jury equity" may result in a *de facto* apportionment, the means by which this is allegedly accomplished have been condemned as destructive of the integrity of the legal system.

Proponents of comparative negligence suggest that there is great public disapproval of contributory negligence, in particular by juries. Opponents counterclaim that there simply is no hue and cry among the populace generally to abandon contributory negligence and replace it with comparative negligence. Critics of contributory negligence point

---

**9.** In addition to the articles by Digges & Klein and by Abraham in 41 Md. L. Rev. (1982), *see* Turk, *Comparative Negligence on the March,* 28 Chi.-Kent L. Rev. 189 (1950); H. Woods, *Comparative Fault* (1978); Wade, *Comparative Negligence — Its Development in the United States and Its Present Status in Louisiana,* 40 La. L. Rev. 299 (1980); V. Schwartz, *Comparative Negligence* 9 (1974); Prosser, *Comparative Negligence,* 51 Mich. L. Rev. 465 (1953); Lowndes, *Contributory Negligence,* 22 Geo. L.J. 674 (1934); *Comments on* Maki v. Frelk — *Comparative v. Contributory Negligence: Should the Court or Legislature Decide?,* 21 Vand. L. Rev. 889 (1968); Powell, *Contributory Negligence: A Necessary Check on the American Jury,* 43 A.B.A. J. 1005 (1957); Maloney, *From Contributory to Comparative Negligence: A Needed Law Reform,* 11 U. Fla. L. Rev. 135 (1958).

to the doctrine's departure from the central principle of tort law that wrongdoers should bear the losses they cause. On the other hand, it is observed that the defendant is also barred by his negligence from collecting from the plaintiff, so that the contributory negligence rule is an equitable one, letting losses lie where they fall in cases where both parties are negligent and both are injured.

Focusing on the theoretical, it is said that the doctrine of contributory negligence inhibits many prospective plaintiffs from suing, or at least encourages settlement of claims before trial. If comparative negligence was the governing rule, the suggestion is advanced that the cases of such potential plaintiffs would reach the jury, and that the flood of litigation thus unleashed would clog the courts, causing increased settlements with corresponding increases in the cost of insurance to the public. Comparative negligence proponents assert, however, that there is no proof that such results will flow from the application of comparative fault principles — that factors other than the particular negligence doctrine adopted and applied are responsible for docket congestion and for insurance rate increases.

Also to be considered is the effect which a comparative fault system would have on other fundamental areas of negligence law. The last clear chance doctrine, assumption of the risk, joint and several liability, contribution, setoffs and counterclaims, and application of the doctrine to other fault systems, such as strict liability in tort, are several of the more obvious areas affected by the urged shift to comparative negligence. Even that change has its complications; beside the "pure" form of comparative negligence, there are several "modified" forms, so that abrogation of the contributory negligence doctrine will necessitate the substitution of an alternate doctrine. Which form to adopt presents its own questions and the choice is by no means clear. *See* Digges & Klein, *supra,* 41 Md. L. Rev. at 282-84. That a change from contributory to comparative negligence involves considerably more than a simple common law adjustment is readily apparent.

## III

As earlier indicated, most of the states which have adopted comparative negligence have done so by statute in derogation of the common law. Prior to the enactment of such statutes, a number of courts in these states had declined to judicially abrogate the contributory negligence doctrine and adopt comparative negligence in its place, in each instance expressly deferring on policy grounds to their respective legislatures. *See Haeg v. Sprague, Warner & Co.,* 202 Minn. 425, 281 N.W. 261 (1938); *Codling v. Paglia,* 32 N.Y.2d 330, 298 N.E.2d 622, 345 N.Y.S.2d 461 (1973); *Krise v. Gillund,* 184 N.W.2d 405 (N. D. 1971); *Baab v. Shockling,* 61 Ohio St. 2d 55, 399 N.E. 2d 87 (1980); *Peterson v. Culp,* 255 Or. 269, 465 P.2d 876 (1970); *Bridges v. Union Pacific Railroad Co.,* 26 Utah 2d 281, 488 P.2d 738 (1971). *See also Rader v. Fleming,* 429 P.2d 750 (Okla. 1967) (court declined to adopt comparative negligence without, however, expressly mentioning deference to the legislature as a reason). A number of courts in jurisdictions which, like Maryland, retain the contributory negligence doctrine have also declined to adopt the comparative negligence doctrine, holding as a matter of policy that any such change should be made by the legislature.[10] *See, e.g., Golden v. McCurry,* 392 So.2d 815 (Ala. 1980); *Steinman v. Strobel,* 589 S.W.2d 293 (Mo. 1979); *McGraw v. Corrin,* 303 A.2d 641 (Del. Super. Ct. 1973).

The eight state supreme courts which have adopted comparative negligence by judicial decision have perceived an imperative need for immediate change. These courts have concluded that contributory negligence is an unfair and outmoded doctrine and that comparative negligence is more equitable and more responsive to the demands of society. These courts have found that because the contributory negligence doctrine was a judicially created rule, the courts could

---

**10.** Retaining the contributory negligence doctrine, in addition to Maryland, are Alabama, Arizona, Delaware, Indiana, Kentucky, Missouri, North Carolina, South Carolina, Tennessee, Virginia, and the District of Columbia. *See* Digges & Klein, *supra,* n. 6.

properly replace it with a proportionate fault system. The first of these decisions, *Hoffman v. Jones,* 280 So.2d 431, decided by the Supreme Court of Florida in 1973, expressed the view that the change to comparative negligence was necessitated by the dictates of a "great societal upheaval." *Id.* at 435. *Li v. Yellow Cab Co.,* 13 Cal.3d 804, 532 P.2d 1226, 119 Cal. Rptr. 858 decided by the Supreme Court of California in 1975, was the second of these decisions to reach this result. The court concluded that no legislative barrier existed to judicial adoption of the comparative negligence doctrine. The Alaska Supreme Court in *Kaatz v. State,* 540 P.2d 1037 (1975), followed the lead of the Florida and California courts in adopting comparative negligence. Michigan was the fourth state to judicially adopt the comparative negligence doctrine. In *Placek v. City of Sterling Heights,* 405 Mich. 638, 275 N.W.2d 511, decided in 1979, the Supreme Court of Michigan, in a detailed opinion, reasoned that comparative negligence was a fairer doctrine than contributory negligence and adopted it. The court saw no need to defer to the legislative process; it indicated that the court was better able to adopt and develop the doctrine of comparative negligence than the legislature and to afford it prospective application. In 1979, West Virginia adopted a "modified" form of comparative negligence, doing so without discussion of the propriety of judicial rather than legislative action. *See Bradley v. Appalachian Power Co.,* 256 S.E.2d 879 (W. Va. 1979). In 1981, the Supreme Court of New Mexico adopted comparative negligence; it found the arguments in favor of judicial deference to the legislature to be unpersuasive. *Scott v. Rizzo,* 96 N.M. 682, 634 P.2d 1234 (1981). Illinois, in 1981, became the seventh state to adopt comparative negligence by judicial decision. In *Alvis v. Ribar,* 85 Ill.2d 1, 421 N.E.2d 886, the Supreme Court of Illinois, over two vigorous dissents, found that changed circumstances warranted the abandonment of contributory negligence and the adoption of comparative negligence. In declining to defer to the legislature, the court noted that contributory negligence was a judicially created doctrine, properly to be replaced by the court which created it. The

court eschewed any need for judicial restraint in favor of legislative action; it noted that in those states which legislatively had adopted proportional fault systems, the statutes were general and did not address collateral issues, leaving the development of the doctrine to the courts. The court found that the failure of the Illinois legislature to enact a comparative negligence statute, even though repeatedly implored to do so, could be attributed to the legislature's belief that the judiciary was better able to adopt and develop the doctrine. In 1982, the Supreme Court of Iowa by a sharply divided court (5 — 4) abandoned contributory negligence in favor of pure comparative negligence, citing as justification the reasons set forth in *Hoffman* and its progeny. *Goetzman v. Wichern,* Iowa, 327 N.W.2d 742 (1982).

## IV

Maryland cases do not reflect any general dissatisfaction with the contributory negligence doctrine. Indeed, the doctrine is a fundamental principle of Maryland negligence law, one deeply imbedded in the common law of this State, having been consistently applied by Maryland courts for 135 years. Nor have we heretofore been confronted with a claim of a pressing societal need to abandon the doctrine in favor of a comparative fault system. Until the publication in 1982 of the Digges & Klein and Abraham articles in the Maryland Law Review, scant attention appears to have been devoted by the bench and bar of this State to the relative merits of the contributory and comparative negligence doctrines.

When called upon, as here, to overrule our own decisions, consideration must be given to the doctrine of *stare decisis* — the policy which entails the reaffirmation of a decisional doctrine of an appellate court, even though if considered for the first time, the Court might reach a different conclusion. *Deems v. Western Maryland Ry.,* 247 Md. 95, 231 A.2d 514 (1966). Under the policy of *stare decisis,* ordinarily, "for reasons of certainty and stability, changes in decisional doc-

trine are left to the Legislature." *Id.* at 102. As the Court observed many years earlier in *DeMuth v. Old Town Bank,* 85 Md. 315, 320, 37 A. 266 (1897):

"[I]t is, in the end, far better that the established rules of law should be strictly applied, even though in particular instances serious loss may be thereby inflicted on some individuals, than that by subtle distinctions invented and resorted to solely to escape such consequences, long settled and firmly fixed doctrines should be shaken, questioned, confused or doubted. . . . It is often difficult to resist the influence which a palpable hardship is calculated to exert; but a rigid adherence to fundamental principles at all times and a stern insensibility to the results which an unvarying enforcement of those principles may occasionally entail, are the surest, if not the only, means by which stability and certainty in the administration of the law may be secured. It is for the Legislature by appropriate enactments and not for the Courts by metaphysical refinements to provide a remedy against the happening of hardships which may result from the consistent application of established legal principles."

Accord, *Hauch v. Connor,* 295 Md. 120, 453 A.2d 1207 (1983); *Austin v. City of Baltimore,* 286 Md. 51, 405 A.2d 255 (1979); *Osterman v. Peters,* 260 Md. 313, 272 A.2d 21 (1971); *White v. King,* 244 Md. 348, 223 A.2d 763 (1966).

Notwithstanding the great importance of the doctrine of *stare decisis,* we have never construed it to inhibit us from changing or modifying a common law rule by judicial decision where we find, in light of changed conditions or increased knowledge, that the rule has become unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people. *Williams v. State,* 292 Md. 201, 438 A.2d 1301 (1981); *Adler v. American Standard Corp.,*

291 Md. 31, 432 A.2d 464 (1981); *Condore v. Prince George's Co.,* 289 Md. 516, 425 A.2d 1011 (1981); *Kline v. Ansell,* 287 Md. 585, 414 A.2d 929 (1980). As we said in *Felder v. Butler,* 292 Md. 174, 182, 438 A.2d 494 (1981), the common law is not static; its life and heart is its dynamism — its ability to keep pace with the world while constantly searching for just and fair solutions to pressing societal problems. However, in considering whether a long-established common law rule — unchanged by the legislature and thus reflective of this State's public policy — is unsound in the circumstances of modern life, we have always recognized that declaration of the public policy of Maryland is normally the function of the General Assembly; that body, by Article 5 of the Maryland Declaration of Rights, is expressly empowered to revise the common law of Maryland by legislative enactment. *See Felder v. Butler, supra,* 292 Md. at 183; *Adler v. American Standard Corp., supra,* 291 Md. at 45. The Court, therefore, has been particularly reluctant to alter a common law rule in the face of indications that to do so would be contrary to the public policy of the State. *See, e.g., Condore v. Prince George's Co., supra,* 289 Md. at 532.

Consistent with these principles, we have on numerous occasions declined to change well-settled legal precepts established by our decisions, in each instance expressly indicating that change was a matter for the General Assembly. *See, e.g., Felder v. Butler, supra* (declining to alter the common law rule pertaining to tort actions against licensed vendors of intoxicating liquors for injuries negligently caused by an intoxicated patron to an innocent third party); *Murphy v. Baltimore Gas & Elec.,* 290 Md. 186, 428 A.2d 459 (1981) (declining to change common law principles governing the duty of care owed a trespasser by a property owner); [11] *Austin v. City of Baltimore,* 286 Md. 51, 405 A.2d 255 (1979) (declining to judicially abrogate the doctrine of governmental immunity in tort actions); *Howard v. Bishop*

---

**11.** For other cases reaching the same conclusion, *see, e.g.,* Bramble v. Thompson, 264 Md. 518, 287 A.2d 265 (1972); Osterman v. Peters, 260 Md. 313, 272 A.2d 21 (1971); Hicks v. Hittaffer, 256 Md. 659, 261 A.2d 769 (1970); Herring v. Christensen, 252 Md. 240, 249 A.2d 718 (1969).

*Byrne Home,* 249 Md. 233, 238 A.2d 863 (1968) (declining to alter the common law rule of charitable immunity from tort liability); *Matakieff v. Matakieff,* 246 Md. 23, 226 A.2d 887 (1967); *Courson v. Courson,* 208 Md. 171, 117 A.2d 850 (1959) (declining to change the common law rule of recrimination in divorce actions in favor of the doctrine of comparative rectitude); *Hensel v. Beckward,* 273 Md. 426, 330 A.2d 196 (1974); *Creaser v. Owens,* 267 Md. 238, 297 A.2d 235 (1972) (declining to change the judicially created "boulevard law" governing the duty and responsibility of a driver approaching a through highway from an unfavored road); *Stokes v. Taxi Operators Assn.,* 248 Md. 690, 237 A.2d 762 (1968) (declining to alter the common law rule governing interspousal immunity in tort actions); *White v. King,* 244 Md. 348, 223 A.2d 763 (1966) (declining to change the common law rule of *lex loci delicti* in tort actions), *reaffirmed in Hauch v. Connor,* 295 Md. 120, 453 A.2d 1207 (1983); and *Cole v. State,* 212 Md. 55, 128 A.2d 437 (1957) (declining to modify the common law M'Naughten rule of criminal responsibility by adding a new element thereto).[12]

These cases plainly reflect our initial deference to the legislature where change is sought in a long-established and well-settled common law principle. The rationale underlying

---

12. In other cases, involving dissimilar circumstances, we have modified common law principles without awaiting legislative action. *See, e.g.,* Lewis v. State, 285 Md. 705, 404 A.2d 1073 (1979) (eliminating procedural common law rule that an accessory may not be tried until the principal has been sentenced); Pope v State, 284 Md. 309, 396 A.2d 1054 (1979) (declining in the absence of Maryland judicial precedent to apply ancient common law doctrine recognizing crime of misprision of felony); McGarvey v. McGarvey, 286 Md. 19, 405 A.2d 250 (1979) (abolishing common law rule disqualifying person convicted of infamous crime from attesting to a will); Lusby v. Lusby, 283 Md. 334, 390 A.2d 77 (1978) (modifying common law rule of interspousal immunity in cases involving extremely outrageous tortious conduct); Adler v. American Standard Corp., *supra,* (modifying common law terminable at-will employment doctrine to conform with recognized public policy of Maryland). Moreover, we have supplemented the common law by recognizing new or novel causes of action. *See, e.g.,* Harris v. Jones, 281 Md. 560, 380 A.2d 611 (1977) (recognizing separate tort of intentional infliction of emotional distress); Phipps v. General Motors Corp., 278 Md. 337, 363 A.2d 955 (1976) (applying strict liability in tort principles); Carr v. Watkins, 227 Md. 578, 177 A.2d 841 (1962) (recognizing invasion of privacy as an independent tort). We have also abandoned common law principles where required by the constitution. Condore v. Prince George's County, *supra.*

these decisions is buttressed where the legislature has declined to enact legislation to effectuate the proposed change. It is thus important in the present case to note that in the period from 1966 through 1982, the General Assembly considered a total of twenty-one bills seeking to replace the contributory negligence doctrine with a comparative fault system. None of these bills was enacted.[13] Although not conclusive, the legislature's action in rejecting the proposed change is indicative of an intention to retain the contributory negligence doctrine. *See, e.g., Kline v. Ansell,* 287 Md. 585, 590-91, 414 A.2d 929 (1980); *Demory Brothers v. Bd. of Pub. Works,* 273 Md. 320, 326, 329 A.2d 674 (1974); *Howard v. South Balto. Gen. Hosp.,* 191 Md. 617, 619, 62 A.2d 574 (1948).

The comparative negligence doctrine is not, as we have already observed, a unitary doctrine but one which has been adopted by other states in either a pure or modified form. Those who advocate one form of the doctrine tend to be critical of the others. Whether to adopt either pure or modified comparative fault plainly involves major policy considerations. Application of pure comparative negligence principles allows a plaintiff to recover his damages regardless of fault, so long as it is less than one hundred percent, thus permitting a grossly negligent but severely

---

**13.** Ten of the proposed bills would have adopted the "pure" form of comparative negligence. *See* S.B. 111 (1966); H.B. 277 (1967); H.B. 158 (1968); H.B. 452 and S.B. 116 (1970); H.B. 556 (1974); H.B. 377 (1976); H.B. 1381 (1979); H.B. 1484 (1980); and S.B. 1007 (1982). Of these, two (H.B. 1381 and H.B. 1484) were modeled after the Uniform Comparative Fault Act. Seven bills proposed a "not as great as" form — where the plaintiff may recover if his negligence is not as great as that of the defendant: H.B. 63 (1969); H.B. 453 (1970); H.B. 546 (1971); H.B. 156 (1972); H.B. 785 (1973); H.B. 405 (1975); and H.B. 633 (1981). Four bills would have applied a "not greater than" form — where the plaintiff may recover if his negligence is not greater than that of the defendant: S.B. 106 (1976); H.B. 2004 (1977); H.B. 1386 (1979); and H.B. 98 (1980).

Of the twenty-one bills, only two emerged from committee. As reported by Digges & Klein, *supra,* at 294, n. 87:

"In 1968, House Bill 158, which applied a 'pure' form of comparative fault to negligence actions involving personal injury, death, or property damage, passed the House of Delegates with a 114 to 8 vote. It then was assigned to the Senate Judicial Proceedings Committee from which it never resurfaced. In 1970, a similar fate befell House Bill 453 which applied the 'not as great as' formula to such negligence actions. The vote in the House was 105 to 12."

injured plaintiff to recover substantial damages from a slightly negligent defendant with only minor injuries. Adoption of such a system would favor the party who incurred the most damages, regardless of the amount of that party's fault. Whether the "pure" proportional fault system is preferable to any of the several types of modified comparative negligence *(see, supra,* footnote 3), or to the doctrine of contributory negligence, is plainly a policy issue of major dimension. Which of these doctrines best serves the societal need is a debatable question. Not debatable is the conclusion that a change from contributory negligence to any form of comparative negligence would be one of great magnitude, with far-reaching implications in the trial of tort actions in Maryland.

All things considered, we are unable to say that the circumstances of modern life have so changed as to render contributory negligence a vestige of the past, no longer suitable to the needs of the people of Maryland. In the final analysis, whether to abandon the doctrine of contributory negligence in favor of comparative negligence involves fundamental and basic public policy considerations properly to be addressed by the legislature. We therefore conclude, as we did in *White v. King, supra,* where we declined to change the common law rule of *lex loci delicti,* that while we recognize the force of the plaintiff's argument, "in the present state of the law, we leave any change in the established doctrine to the Legislature." [14] 244 Md. at 355.

*Judgment affirmed, with costs.*

*Davidson, J., dissenting:*

In Maryland, as elsewhere, the common law may be changed by legislative act. It may also be changed by judicial decision if this Court is convinced that it has become unsound in the circumstances of modern life. *See, e.g.,*

---

14. Nothing in the Supreme Court's decision in United States v. Reliable Transfer Co., 421 U.S. 397, 95 S. Ct. 1708, 44 L. Ed. 2d 251 (1975), persuades us to reach a different result.

*Moxley v. Acker,* 294 Md. 47, 52, 447 A.2d 857, 859-60 (1982); *Kline v. Ansell,* 287 Md. 585, 589-90, 414 A.2d 929, 931 (1980). As recognized by the majority, this Court has frequently modified the common law without deferring to the Legislature.[1] Nonetheless, the majority here refuses to abrogate the doctrine of contributory negligence and to adopt the doctrine of comparative negligence by judicial decision. It chooses instead to defer to the Legislature.

The majority offers three basic reasons in support of its position. First, it finds that there has been neither "any general dissatisfaction with the contributory negligence doctrine" nor any previous "claim of a pressing societal need to abandon the doctrine in favor of a comparative fault system." Additionally, it concludes that "the circumstances of modern life have [not] so changed as to render contributory negligence a vestige of the past, no longer suitable to the needs of the people of Maryland." Second, it points out that on various occasions, the General Assembly considered but failed to enact laws replacing the contributory negligence doctrine with a comparative negligence doctrine. It concludes that "the legislature's action in rejecting the proposed change is indicative of an intention to retain the contributory negligence doctrine." Finally, it asserts that the question whether "to abandon the doctrine of contributory negligence in favor of comparative negligence involves fundamental and basic public policy considerations properly to be addressed by the legislature." I do not find any of these reasons persuasive.

---

1. *See, e.g.,* Moxley v. Acker, 294 Md. 47, 52-53, 447 A.2d 857, 860 (1982); Williams v. State, 292 Md. 201, 217, 438 A.2d 1301, 1309 (1981); Adler v. American Standard Corp., 291 Md. 31, 43, 432 A.2d 464, 471 (1981); McGarvey v. McGarvey, 286 Md. 19, 28, 405 A.2d 250, 255 (1979); Lewis v. State, 285 Md. 705, 716, 404 A.2d 1073, 1079 (1979); Pope v. State, 284 Md. 309, 352, 396 A.2d 1054, 1078 (1979); Lusby v. Lusby, 283 Md. 334, 335, 390 A.2d 77, 77 (1978); Harris v. Jones, 281 Md. 560, 566, 380 A.2d 611, 614 (1977); Lightfoot v. State, 278 Md. 231, 237-38, 360 A.2d 426, 430 (1976); Phipps v. General Motors Corp., 278 Md. 337, 352-53, 363 A.2d 955, 963 (1976); Shilkret v. Annapolis Emergency Hosp., 276 Md. 187, 200-01, 349 A.2d 245, 248 (1975); Deems v. Western Maryland Railway Co., 247 Md. 95, 100, 115, 231 A.2d 514, 517, 525 (1967); Carr v. Watkins, 227 Md. 578, 586, 177 A.2d 841, 845 (1962).

I do not agree that the doctrine of contributory negligence remains viable in the circumstances of modern life. Maryland initially adopted the doctrine of contributory negligence in 1847. Since that time, virtually every common law and civil law country, including England, has abandoned the doctrine of contributory negligence in favor of the doctrine of comparative negligence. In this country, 39 states have abandoned the doctrine of contributory negligence and have adopted the doctrine of comparative negligence — 31 by legislative enactment and 8 by judicial decision. Puerto Rico, the Virgin Islands, and Guam have abandoned the doctrine of contributory negligence in favor of the doctrine of comparative negligence. The United States Supreme Court has discarded the doctrine of divided damages in favor of the doctrine of comparative negligence in the field of admiralty law. In addition, virtually all of the legal commentators now favor discarding the doctrine of contributory negligence.

Manifestly, legislatures, courts, and commentators overwhelmingly agree that the doctrine of contributory negligence must be discarded in favor of the doctrine of comparative negligence. The fundamental reason for this virtually universal rejection of the doctrine of contributory negligence is that it is unfair. It is a harsh and arbitrary rule because its "all or nothing" approach permits fault on the part of an injured person to relieve another person partially responsible for the injury from all liability. Correlatively, legislatures, courts, and commentators overwhelmingly agree that the doctrine of comparative negligence produces a more just and socially desirable distribution of loss.

The massive erosion of the doctrine of contributory negligence evidences a compelling societal dissatisfaction with that doctrine, as well as a compelling societal demand for its demise. Moreover, this erosion evidences a basic attitudinal change in society's concept of fairness. In my view, this attitudinal change is so substantial that it renders contributory negligence a vestige of the past, no longer suitable to the needs of people. I am not convinced that in Maryland, society's concept of fairness differs in any signifi-

cant degree from the concept of fairness shared in all of those common law and civil law jurisdictions throughout the world that have abandoned the doctrine of contributory negligence in favor of the doctrine of comparative negligence. I am convinced that in Maryland, as elsewhere, the doctrine of contributory negligence has become unsound under the circumstances of modern life.

Additionally, I do not agree that the Legislature's failure to replace the doctrine of contributory negligence with that of comparative negligence indicates a legislative intent to retain the contributory negligence doctrine. This Court has repeatedly held that the Legislature's failure to enact legislation is a "weak reed upon which to lean" in drawing a positive inference of legislative intent. *Automobile Trade Ass'n of Maryland, Inc. v. Insurance Comm'r of Maryland,* 292 Md. 15, 24, 437 A.2d 199, 203 (1981); *Harden v. Mass Transit Admin.,* 277 Md. 399, 406, 354 A.2d 817, 820-21 (1976). Moreover, this Court has repeatedly recognized that such an inference is particularly unreliable when there are alternative rationalizations, both equally palatable to explain the Legislature's failure to act. *Police Comm'r of Baltimore City v. Dowling,* 281 Md. 412, 420-21, 379 A.2d 1007, 1012 (1977); *Hearst Corp. v. State Dept. of Assessments & Taxation,* 269 Md. 625, 644, 308 A.2d 679, 689 (1973).

Here, it may reasonably be argued that the Legislature's failure to abolish the doctrine of contributory negligence evidences its judgment that the diffuse collateral issues associated with such a modification of the common law can better be resolved by the judiciary on a case by case basis than by the Legislature through a comprehensive enactment. Under these circumstances, the Legislature's failure to act does not necessarily indicate an intent to retain the contributory negligence doctrine. Accordingly, in my view, legislative inaction here does not constitute an impediment to abrogation of the doctrine of contributory negligence by judicial decision.

Finally, I do not agree that it is more appropriate for the Legislature than for the courts to determine whether to abandon the doctrine of contributory negligence in favor of the doctrine of comparative negligence. In a recent article, *Adopting Comparative Negligence: Some Thoughts for the Late Reformer,* 41 Md.L.Rev. 300 (1982), Professor Kenneth S. Abraham made a thoughtful and sophisticated analysis of the propriety of judicial adoption of the doctrine of comparative negligence. There, he said:

"The argument that adopting a comparative negligence rule is beyond the province of the courts has always had a hollow ring to it. *Contributory negligence, after all, is a court-created doctrine; the courts would seem not to be automatically precluded from modifying what they have created. And the reasons often given for abolishing contributory negligence* — its unfairness in penalizing plaintiffs for very small amounts of carelessness and the case-to-case inconsistencies that result from relying on a rule that conflicts with the jury's intuitive notions of fairness — *are characteristically the kinds of arguments that courts consider in fashioning legal doctrine.*

"Furthermore, at this point in the development of comparative negligence, a court considering the doctrine has more than theory to inform it. The argument against judicial adoption is ultimately that it would be antidemocratic — that so fundamental a decision about civil liability should be made by a representative branch of government. *Yet never has a judicial decision to adopt comparative negligence been legislatively overturned — even in those states whose legislatures had considered, but had not enacted comparative negligence prior to judicial adoption of the doctrine.* That legislatures in these states did not overrule this judicial action obviously does not prove anything about the desires of the people of Maryland or their

representatives. But it does suggest that concern about legislative prerogatives can be overemphasized.

. . .

"Finally, it is sometimes said that although the decision to adopt comparative negligence resembles the kind of choices typically made by courts, the subsidiary issues that must be faced in implementing a comparative negligence system are characteristically legislative. For example, if courts adopt comparative negligence, they also will have to decide how to treat the problems of joinder and set-off and the role of such doctrines as assumption of risk and last clear chance. Put this all together, the argument goes, and it amounts to a wide-ranging tort reform statute enacted by a court.

"The weakness of this argument is twofold. First, much of the law regarding these problems is judge-made. The courts have the authority and the competence to modify it. And no court would have to announce in a declaratory judgment its resolution of all these issues. *At least some of these problems could be resolved on a case-by-case basis, in the way that courts usually make decisions. Second, and more important, the typical comparative negligence statute deals with few of these issues.* The argument that the courts should defer to legislatures on such matters thus has no practical significance. *Even in states whose legislatures have mandated comparative negligence the courts have had to develop detailed frameworks for implementing the doctrine and resolving the issues that arise after its adoption.*

"In sum, the proper allocation of authority between legislatures and courts on this question is not crystal clear. Some of the issues that must be resolved in deciding whether to adopt comparative

negligence are characteristically judicial issues. Others are less typically the kind that can be easily resolved by a court, but seem to have been left for judicial resolution even in the states that have enacted comparative negligence legislation. *Unlike judicial resolution of constitutional questions, a court's decision to adopt comparative negligence can be overturned or modified by the legislature.* Thus, any threat to popular government from judicial adoption of comparative negligence can be remedied easily. *Yet in none of the seven states whose courts have adopted comparative negligence has the legislature overturned that judicial decision.* In each case, rather, legislatures have acquiesced in the adoption of the doctrine. Although there are arguments against the existence of judicial authority to adopt this doctrine, then, such action certainly is not obviously inappropriate. If anything, *the balance seems to lie on the side of judicial authority to adopt comparative negligence."* 41 Md.L.Rev. at 304-06 (footnotes omitted) (emphasis added).

I agree with Professor Abraham that it is appropriate for this Court to adopt the doctrine of comparative negligence and that there is no compelling reason to defer to the Legislature. Courts in other jurisdictions that have considered the respective roles of a court and a legislature in the development of the law, and have adopted the doctrine of comparative negligence, agree. Thus, in *Alvis v. Ribar,* 85 Ill.2d 1, 23-25, 421 N.E.2d 886, 896-97 (1981), the Supreme Court of Illinois said:

"*We believe that the proper relationship between the legislature and the court is one of cooperation and assistance in examining and changing the common law to conform with the ever-changing demands of the community.* There are, however, times when there exists a mutual state of inaction in which the court awaits action by the legislature

and the legislature awaits guidance from the court. Such a stalemate is a manifest injustice to the public. When such a stalemate exists and the legislature has, for whatever reason, failed to act to remedy a gap in the common law that results in injustice, *it is the imperative duty of the court to repair that injustice and reform the law to be responsive to the demands of society.*

. . .

"The tenets of *stare decisis* cannot be so rigid as to incapacitate a court in its duty to develop the law. *Clearly, the need for stability in law must not be allowed to obscure the changing needs of society or to veil the injustice resulting from a doctrine in need of re-evaluation.* This court can no longer ignore the fact that Illinois is currently out of step with the majority of States and with the common law countries of the world. We cannot continue to ignore the plight of plaintiffs who, because of some negligence on their part, are forced to bear the entire burden of their injuries. Neither can we condone the policy of allowing defendants to totally escape liability for injuries arising from their own negligence on the pretext that another party's negligence has contributed to such injuries. We therefore hold that in cases involving negligence the common law doctrine of contributory negligence is no longer the law in the State of Illinois, and in those instances where applicable it is replaced by the doctrine of comparative negligence." (Citation omitted).

Similarly, in *Hoffman v. Jones,* 280 So.2d 431, 436 (Fla. 1973), the Supreme Court of Florida said:

" 'It may be argued that any change in this rule should come from the Legislature. No recitation of authority is needed to indicate that this Court has not been backward in overturning unsound prece-

dent in the area of tort law. *Legislative action could, of course, be taken, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule.'* " (Emphasis in original).

I agree that, when the application of a common law principle results in injustice, it is the duty of a court to modify the common law if a legislature has failed to act. The need for stability in the law cannot justify a court's perpetuation of outmoded and unfair court-made doctrines.

In sum, unlike the majority, I agree with the overwhelming number of legislatures, courts, and commentators that the doctrine of contributory negligence has become unsound under the circumstances of modern life. Moreover, I do not agree with the majority that the Legislature's failure to act constitutes an impediment to the judicial adoption of the comparative negligence doctrine. Additionally, I do not agree with the majority that there is any compelling reason to defer to the Legislature. Accordingly, I will not abdicate what I view as judicial responsibility to accommodate the law to the changing needs of society and to assure substantial justice. I would not relegate the people of this State to the perpetuation of a court-made doctrine deemed outmoded and unjust by all but 11 states and the District of Columbia. I would abrogate the doctrine of contributory negligence and adopt the doctrine of comparative negligence. I, therefore, respectfully dissent.